DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant Matthew Lee Morris has appealed from his convictions in the Summit County Court of Common Pleas of two counts of murder, one count of felonious assault, and one count of endangering children. This Court affirms.
 I {¶ 2} Appellant was indicted by secret indictment on August 13, 2003 for one count of murder in violation of R.C. 2903.02(B), a special felony with felonious assault as the predicate offense; one count of murder in violation of R.C. 2903.02(B), a special felony with endangering children as the predicate offense; one count of felonious assault in violation of R.C. 2903.11(A)(1); and one count of endangering children in violation of R.C. 2919.22(B)(1). As a result of the secret indictment, an arrest warrant was issued for Appellant and Appellant was arrested on August 14, 2003. On August 22, 2003, Appellant entered "not guilty" pleas to all four charges. A jury trial commenced on April 6, 2004 and on April 12, 2004 the jury found Appellant guilty as charged in the indictment. Appellant has timely appealed, asserting three assignments of error.
 II Assignment of Error Number One
"Defendant-appellant's convictions were against the manifest weight of the evidence."
 {¶ 3} In his first assignment of error, Appellant has argued that the trial court erred because his conviction was against the manifest weight of the evidence. Specifically, Appellant has argued that the State failed to prove beyond a reasonable doubt 1) that he was the perpetrator of this crime and 2) the mens rea of the crimes, i.e., knowingly and recklessly. Appellant has also asserted an "even if" argument claiming that even if identity and the appropriate mens rea were established, the most serious crime that occurred was reckless homicide. We disagree.
 {¶ 4} In reviewing whether a conviction is against the manifest weight of the evidence, this Court must:
"[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten
(1986), 33 Ohio App.3d 339, 340.
 {¶ 5} Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. State v. Thompkins (1997), 78 Ohio St.3d 380, 387. Further, when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. Id.
 {¶ 6} In the instant appeal, Appellant was convicted of two counts of murder in violation of R.C. 2903.02(B). Pursuant to R.C. 2903.02(B):
"No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of [R.C. 2903.03 or R.C. 2903.04]."
 {¶ 7} Appellant's first murder conviction was based on the predicate offense of felonious assault in violation of R.C. 2903.11(A)(1), which is an offense of violence under R.C. 2901.01(9)(a). R.C. 2903.11(A)(1) mandates that "[n]o person shall knowingly * * * [c]ause serious physical harm to another[.]" Felonious assault is a felony of the second degree. R.C. 2903.11(D).
 {¶ 8} Appellant's second murder conviction was based on the predicate offense of endangering children in violation of R.C. 2919.22(B)(1), which is also an offense of violence under R.C. 2901.01(9)(a). Pursuant to R.C. 2919.22(B)(1): "No person shall do any of the following to a child under eighteen years of age * * *: (1) Abuse the child[.]" Although not stated in the statute, the mens rea for endangering children is recklessness. State v. Adams (1980), 62 Ohio St.2d 151, paragraph one of the syllabus. When the abuse of the child results in serious physical harm to said child, a violation of R.C. 2919.22(B)(1) constitutes a felony of the second degree. R.C. 2919.22(E)(2)(d).
 {¶ 9} Appellant was also convicted of a separate count of felonious assault in violation of R.C. 2903.11(A)(1) and a separate count of endangering children in violation of R.C. 2919.22(B)(1).
 {¶ 10} As an initial matter, this Court notes that the extensive and at times complex trial testimony in the instant matter has lead to a lengthy appellate opinion. As part of our review we have read the testimony and we have determined that given the type crime involved it is necessary to reiterate the essential testimony in our opinion.
 {¶ 11} George Sewald ("Sewald"), a Cuyahoga Falls Fire Department Captain, testified first for the State. On direct examination, Sewald testified to the following. On August 2, 2003 at approximately 10:10 a.m., the Cuyahoga Falls 911 dispatcher received a call that an infant was not breathing. Sewald, a fire engine, and a paramedic squad responded to the location of the call, 149 Hayes Avenue ("the house").
 {¶ 12} Sewald arrived first on the scene, within just over two minutes from the 911 call, and entered the house. He was met by Appellant, who appeared "very distraught," and another man. Sewald found the infant "pulseless, nonbreathing, [with] some mucous in her mouth." He found the infant warm to the touch. Unsure if the infant was suffering from a choking episode, Sewald administered "four back blows to the infant" between the shoulder blades directly on the spine.
 {¶ 13} While continuing resuscitative measures he attempted to obtain some history from the family. Appellant informed Sewald that the infant had been awake and functioning an hour prior to the 911 call. Sewald then conducted mouth-to-mouth on the infant and although he was able to "get some breaths into her" she remained pulseless. He then began chest compressions per the American Heart standards. Sewald used two fingertips, "mid-external, mid-nipple, compression roughly one-half inch. [C]ompressing the heart between the sternum and the spine, * * * at a rate of 100." Sewald was not looking for bruises or abuse during his rescue efforts. His main concern was the "life-threatening condition the child [was] in." He proceeded with a couple of cycles of CPR and by then the paramedic squad and fire engine had arrived and assisted him. Unfortunately, the infant did not respond to Sewald's resuscitative efforts.
 {¶ 14} Two members of the squad exited the house to prepare the ambulance to transfer the infant and six members stayed in the house to assist Sewald. Sewald then carried the infant out of the house and placed her on the ambulance cot with his fellow firefighters. Within five minutes of Sewald's and the other response teams' arrival, the infant was transported to Akron Children's Hospital ("Children's").
 {¶ 15} On cross-examination, Sewald testified to the following. Although Sewald could not describe with certainty what the infant was wearing, he remembered that her neck and face were not covered by her clothing. Based on the information from the family that the infant was awake about an hour before the call and that she was still warm, Sewald did not suspect that she had been deceased for a long period of time. Sewald did not notice any trauma to the infant when he attempted resuscitation. Appellant was crying when Sewald entered the house and acted appropriately for someone who was losing his child. Appellant, another older man, and a toddler were the only people in the house with the infant.
 {¶ 16} On re-direct examination, Sewald testified to the following. No one in the house indicated that the infant had been dropped or rolled over or anything of that nature. No one indicated that something had accidentally or intentionally happened to the infant. Appellant's behavior could also have been attributed to guilt from killing his child.
 {¶ 17} The State next called Stephen Lyons ("Lyons"), a Cuyahoga Falls firefighter/paramedic. Lyons testified to the following. On August 2, 2003, Lyons, along with Lieutenant Don Witner and firefighter John-Paul Paxton, responded to a 911 call regarding a child in need of assistance. Lyons and his coworkers arrived at the house within two minutes and 14 seconds of the 911 call. When Lyons arrived on the scene, he saw a young man, an older man, a young child and the infant. The father of the infant stated that he was asleep on the couch with the infant on his chest and awoke and found the baby not breathing. The baby had been taking an over-the-counter medicine for colic because the baby had been crying a lot. Lyons assisted Sewald out of the house with the infant and once seated in the ambulance he took the infant from Sewald and continued CPR.
 {¶ 18} While en route to the hospital, Lyons performed CPR and chest compressions. The infant was also receiving oxygen from a bag valve mask and was placed on a heart monitor. The paramedics were unable to start an IV in the ambulance. The infant did not respond to the treatment she received on the way to the hospital. From the time Sewald arrived at the scene until the infant arrived at the hospital CPR was being performed. The ambulance left the house at 10:17 a.m. and arrived at the hospital at 10:24 a.m.
 {¶ 19} On cross-examination, Lyons testified to the following. The paramedics did not perform a physical examination of the infant in the house. Lyons did not see any signs of trauma on the infant. Appellant was distraught and crying in the house and in the ambulance. The infant's neck was not covered by her clothing.
 {¶ 20} Eric Davis ("Davis"), a Cuyahoga Falls firefighter/paramedic, testified next for the State. Davis testified to the following. On August 2, 2003, Davis was riding in the fire engine when it responded to a medical call to assist the ambulance squad at the house. Once on the scene, Davis jumped into the driver's seat of the ambulance because he knew it was going to be a "load-and-go." A "load-and-go" occurs when the paramedics "grab the baby, put it in the squad and take off to the hospital; spending as little time as possible on the scene." Davis decided to drive the ambulance because he knew that "they would need everybody they could to get in the back to assist them with the child." Davis drove the ambulance to the hospital, with Appellant riding in the passenger seat. Appellant did not speak directly to Davis, but he did say, "`My baby. I can't believe this. My baby.'" When they arrived at the hospital, Appellant did not seem to be exiting the ambulance so Davis assisted him out of the vehicle.
 {¶ 21} On cross-examination, Davis testified to the following. Appellant was visibly upset with the situation. Once Davis assisted Appellant out of the ambulance, he did not hesitate to follow his child.
 {¶ 22} The State called Dr. Norman Christopher ("Christopher"), an emergency room ("ER") physician at Children's, as its next witness. Christopher testified to the following. Christopher was working in the ER when the infant arrived. When Christopher and his team began treatment, the infant showed no signs of life so they "initiated very aggressive treatment." Christopher's main goals were the infant's airway, her breathing and her circulation. The first focus in the ER is providing care and assessing what treatment is necessary. Christopher and his team secured the infant's airway and began an IV to supply medication to try to revive or resuscitate the infant's heart. In the meantime, chest compressions were continued. The records from the ER showed that the infant was declared dead at 10:44 a.m.
 {¶ 23} Christopher and his team treated the infant "very aggressively and * * * gave every opportunity in the treatment room." Christopher did not think about looking for signs of abuse or trauma during his course of treatment because he viewed his role as taking care of the infant and her family. It was not Christopher's responsibility to determine the infant's cause of death. The process of determining how a child died continues on past the date of admission, sometimes taking days.
 {¶ 24} Christopher did examine the infant after the baby had passed away. While examining the vascular surface of the back of the eye, the fundi, he discovered that "both fundi were diffusely hyperemic." He explained that "usually, when you look through that window [of the eye], that lens in the front of the eye up to the back of the eye, what you usually see * * * a pink or a white surface with a circle in the middle and little, tiny blood vessels coming out." Instead of seeing what he usually sees, Christopher discovered that "the fundi were diffusely hyperemic, meaning instead of discrete blood vessels, [he] saw that the surface, the inside of the eye was just red, just a solid red color." While Christopher did not see retinal hemorrhaging, he did note the surface of the back inside surface of the eye was diffusely red. He was aware that finding a retinal hemorrhage would indicate shaken baby syndrome and he was unwilling to find that at the time of his report.
 {¶ 25} Christopher did not initially notice bruising on the infant, but while a nurse was preparing the infant for a family viewing, she noticed the bruises and alerted him. The nurse asked Christopher if he had noticed bruises on the infant's shoulder and on the left side of her neck. He informed the nurse he had not noticed the bruising and that he was not sure what it was from. Christopher was focused on saving the infant and not determining the cause of death. He admitted that there may have been "a certain amount of denial on [his] part." He remained with the infant's family after his shift ended, even visiting the chapel with them.
 {¶ 26} After learning that Appellant was very upset after his daughter died, Christopher gave Appellant a single dose of anti-anxiety medicine. Appellant had been "extremely anxious, very tearful, shaking, [and] vomiting."
 {¶ 27} In retrospect, Christopher could see a connection between the hyperemic fundi and the ultimate finding of the infant's death. In all the patients that have died in front of Christopher, he had never seen anything like the infant's eyes. Christopher could not say the baby was not shaken.
 {¶ 28} On cross-examination, Christopher testified to the following. During his treatment of the infant he did not notice any bruising on the infant's head. Although a nurse informed Christopher of the bruising on the infant's back and neck, he did not include that in his report. The report did include a history of the case which revealed that Appellant was sleeping on the couch with the infant on his chest and Appellant's stepfather entered the room and noticed that the infant was not moving. When the men attempted to awaken the infant she was unresponsive.
 {¶ 29} On re-direct examination, Christopher testified to the following. He thought the timing of the baby coming in was a little odd because normally cases with unresponsive babies come in between 5 and 7 a.m. because the parents discover the babies are not waking up to eat as they usually do, with such cases sometimes involving Sudden Infant Death Syndrome ("SIDS"). Christopher did not inform any member of the infant's family that the infant died from SIDS. Christopher had previously informed Appellant's counsel that a nurse had showed him bruises on the infant's body.
 {¶ 30} On re-cross examination, Christopher testified to the following. He heard from Appellant's wife that the infant may have died from SIDS, but he did not tell her that. Christopher had no opinion about the infant's cause of death and a possible SIDS-related death.
 {¶ 31} Gary Guenther ("Guenther"), an investigator for the Summit County Medical Examiner, testified next for the state. Guenther testified to the following. He was working on August 2, 2003 and was called to investigate an unnatural death at Children's after the infant died. As part of his investigation, Guenther spoke with Appellant and reviewed his daughter's medical history and the events leading up to her death. Appellant told Guenther that on the evening of August 1, 2003, the infant was running a slight fever and had gas-like symptoms so he gave her some Tylenol to attempt to break the fever. Appellant also said the infant was very colicky and would cry a lot. Around 8:00 p.m. Appellant took the infant for a car ride to settle her down. When they returned Appellant gave the infant a bottle and she fell asleep.
 {¶ 32} Appellant continued his recitation of the night's events and told Guenther that the infant awoke around 3:30 a.m. crying. After about 2 hours of trying to feed her and calm her down, Appellant took the infant for another car ride. They returned around 6:00 a.m. and fell asleep together on the couch. When Appellant's step-father came downstairs around 10:00 a.m. they noticed the infant was not breathing. They immediately called 911 and began CPR.
 {¶ 33} Appellant did not mention anything to Guenther about trauma to the infant, that he rolled over onto the infant, that the infant accidentally fell from a height or that the infant was smothered, squeezed, or shaken. Guenther found Appellant very hard to talk to because he was very emotional. Guenther viewed the baby in the treatment room and did not notice any signs of trauma. After speaking with his colleagues, it was decided that Children's would perform the autopsy. The following morning, Sunday, August 3, 2003, Guenther received a phone call from Children's that a cranial trauma had been discovered in the infant. The infant was then transported to the Summit County Medical Examiner's office ("M.E.'s office") for a complete autopsy.
 {¶ 34} On cross-examination, Guenther testified to the following. Guenther did not notice any bruising or marks on the infant when he examined her at the hospital on August 2, 2003. After his initial examination, he did not feel there had been any abuse. Guenther was not involved in the transport of the infant to the M.E.'s office and he had no knowledge of anything that occurred during the transfer.
 {¶ 35} On re-direct examination, Guenther testified to the following. The bruises that were discovered on the infant after his initial examination could have been very faint when he first looked at the infant. "It usually takes a while for a bruise to develop."
 {¶ 36} The State next called Matthew Flach, Sr. ("Flach"), Appellant's step-father, and he testified to the following. Appellant and his wife had been visiting Flach and his wife, Appellant's mother, from Chicago. Flach's wife, his son, and Appellant's wife drove to Chicago on August 1, 2003. That same day, Flach arrived home from work around 4:20 p.m. and Appellant and Appellant's two children, a toddler and the infant at issue, were in the house. After getting cleaned up from work, Flach made dinner for everyone and he and the toddler ate in the kitchen and Appellant and the infant ate in the living room. Around 7:30 or 8:00 p.m. the children were fussy so Appellant suggested they take them for a car ride. Appellant, Flach and both children entered Appellant's sport utility vehicle for a drive. Appellant placed the infant in her car seat, and Flach placed the toddler in his car seat. They drove around for almost an hour and the children calmed down. On the way home, they stopped at a drive-thru and Flach bought some beer.
 {¶ 37} Upon their return to Flach's house, Appellant removed the infant from her car seat and Flach attended to the toddler. All four of them watched television. Flach never held the infant. Appellant was taking care of the infant. Around 10:00 p.m. Appellant took the children to bed in the upstairs bedroom Appellant was sharing with his wife and two children. The bedroom had no crib so the children were sleeping in the bed with their parents. Flach remained downstairs until 3:00 a.m. He did not hear anything from upstairs while he was watching television. Flach went to bed in his bedroom which is across the hall from where Appellant and the children were sleeping
 {¶ 38} Flach awoke around 4:00 a.m. when he heard the infant crying. She cried for a "couple of minutes." He heard Appellant take the infant downstairs. The infant usually woke up around 4:00 a.m. to eat. Flach did not get out of bed and did not see Appellant. Flach heard Appellant fixing a bottle and went back to sleep; he did not hear anyone come back upstairs.
 {¶ 39} That morning Flach woke up around 10:00 a.m. and went downstairs and found Appellant and the children sleeping in the living room in front of the television, which was still on. After retrieving the paper and letting his dog outside, Flach returned to the living room and sat cattycorner from the couch where Appellant was sleeping with the infant on his chest. Flach read "the paper a little bit, and [he] looked over at [Appellant]" and asked how the infant was doing because she had been colicky all week. Appellant answered Flach stating: "`Oh, she's doing pretty good.'" Then Appellant noticed something was wrong. Appellant picked the infant up and looked at her, put her back on the couch and listened for a heartbeat and then told Flach that something was wrong and to call 911.
 {¶ 40} Flach immediately called 911. He was instructed by the dispatcher how to perform CPR on the infant and he began CPR. While Flach was speaking with the 911 dispatcher and performing CPR, Appellant was really upset and he "didn't know what to do." Once the paramedics arrived they took over CPR. At one point, one of the paramedics turned the infant over and "popped" her with his open hand. Flach never witnessed anyone hit the infant with an object with a square corner or edge. The couch the infant was sleeping on was completely padded and the coffee table in the living room had curved edges. The bedroom that Appellant shared with his wife and children had various furniture items with square corners, specifically, a cedar chest, a dresser, a headboard, and a footboard.
 {¶ 41} When the paramedics picked the infant up and took her to the ambulance Appellant asked Flach to go with them to the hospital. Flach told Appellant that he should go with her. Flach stayed in the house with the toddler. Sometime later, a nurse called from the hospital and told Flach that Appellant wanted Flach and the toddler to come to the hospital.
 {¶ 42} Flach had no physical contact with the infant from the time he got home from work on August 1, 2003 until he performed CPR on her on August 2, 2003. Appellant was the only person who had physical contact with the infant during that time period. Flach did not hear the infant fall or anything fall on her during that time period. Appellant never told him anything happened to the infant during that time period.
 {¶ 43} During Flach's testimony, the State played the recorded 911 call Flach placed on August 2, 2003. In the recording, Flach informed the dispatcher that his granddaughter was not breathing and the dispatcher instructed him on how to perform CPR on the infant. Flach was the only person who talked to the operator. Sewald can be heard arriving in the house and asking questions about the baby. When asked when the last time the baby was okay a voice can be heard saying that the baby was fine about an hour prior to the 911 call. Flach believed the voice was Appellant's, but he "couldn't really tell." Flach admitted that no one else was in the house with him, Appellant and Sewald when the call was being recorded.
 {¶ 44} After Flach heard Appellant go downstairs around 4:00 a.m., he heard the microwave dinger sound and figured Appellant had made a bottle for the infant. Flach did not hear anything else during the night. Flach believed he would have heard someone beating a child or shaking a child in his house. When Flach asked Appellant how the infant was doing, Appellant looked "surprised" when he discovered there was a problem. Flach did not notice any bruises on the infant while he was performing CPR.
 {¶ 45} When he arrived at the hospital, a nurse informed Flach that the infant had died and that she died from SIDS. Flach also testified that Christopher told him and his family that the infant died from SIDS.
 {¶ 46} On re-direct examination, Flach admitted that he did not know what happened in the house while he was sleeping. Flach did not know if the infant was smacked, hit or shaken while he was sleeping. Flach did not hear Appellant leave the house on the morning of August 2, 2003 to take the children for another car ride. He did not hear his house door open and close, three car doors open and close, or Appellant's car start.
 {¶ 47} Flach and his wife visited Appellant, his wife, and their children in Chicago after the infant was born. They stayed in a hotel, but saw Appellant and his family every day. Over the four day visit, Appellant was never the exclusive caregiver of his children. Flach explained that there were many people in the home to take care of the children, such as Flach's wife, Appellant's wife, and her family. The only time Flach observed Appellant alone with the children was the evening of August 1, 2003 to the morning of August 2, 2003. Flach did not see or hear his infant granddaughter being shaken or injured before she was taken to the hospital.
 {¶ 48} The State's next witness was Dr. George Sterbenz ("Sterbenz"), a deputy chief medical examiner in the M.E.'s office. Sterbenz testified to the following. He first learned of the infant's death on the day she died and it was decided that Children's would perform the autopsy. When the autopsy revealed a skull fracture, it was decided that the autopsy would be conducted at the M.E.'s office.
 {¶ 49} While conducting the autopsy, Sterbenz discovered bruises and contusions. "They were located on her frontal scalp area, and there was a cluster in [the right frontal area]. She also had some bruises at the back of her neck, the right and left back sides of her neck, and over the back side of her right shoulder area." The contusion at the back of her left side of her neck continued to the lower part of her scalp. A "right-angled type contusion" was found on the back of the infant's neck and another contusion or bruise intersected with it. The right rear side of the infant's neck contained "a faint cluster of contusions." The only injuries that are characteristic of resuscitative efforts were found under the infant's chin. "All of [the] other injuries are not at all characteristic of any kind of resuscitative intervention."
 {¶ 50} After completing the external examination, Sterbenz conducted an internal examination. Sterbenz found multiple areas with rib fractures. He found "27 sites of healing [rib] fractures[,]" which were in the "two-to-four week [old] range." He also found 6 fresh fractures, which were "fresh at the time of her death, not fresh at the time of the examination." The rib fractures could not have been due to resuscitative measures. Sterbenz determined that the rib fractures in the infant were "inflicted injuries, and that the pattern of injury in an infant like this is consistent with a squeezing mechanism that when the — when a child is squeezed, the — their ribs can bend * * * they can snap and break[.]" An adult holding a baby under its arms and squeezing would result in the rib fractures present in the infant. Sterbenz reviewed the infant for disease to account for her broken ribs and consulted other doctors and his conclusion was that the infant did not suffer from a skeletal disease. He also determined that the infant's injuries could not have occurred when Sewald turned the infant over on her stomach and administered the blows to ensure a free airway.
 {¶ 51} Sterbenz also confirmed the presence of a skull fracture. The nondisplaced fracture was on the right side of the infant's head and "about twoand-a-half centimeters in length [.]" The fracture was not found on the radiology examination because nondisplaced fractures are not frequently identified by radiograph. The fracture was fresh, "meaning fresh or very, very recent to the time of the child's death."
 {¶ 52} Sterbenz also discovered "very significant hemorrhage or bleeding within its head in the space that's between the skull and above the brain." He determined the infant had a subdural hemorrhage. Such an injury "is very, very indicative of violent shaking acceleration[.] Essentially a type of whiplash injury, back and forth, over and over again of the head."
 {¶ 53} As he continued his examination, Sterbenz also discovered "severe hemorrhages along the nerves to the eyes, the optic nerves " and "severe diffuse hemorrhages of the retina." He concluded that:
"[the infant's] pattern of injury, the retinal hemorrhages with its severity and its diffuse nature, the optic nerve hemorrhages and its severity and diffuse nature, and the subdural hemorrhage, the hemorrhage in the head or over the top of the brain in its somewhat uniform distribution over the top of the head, is very strongly, very, very strongly indicative of * * * shaken baby syndrome, where a child is shaken and with severe whiplash or acceleration/deceleration type injury resulting in death."
 {¶ 54} From his examination, Sterbenz determined that "the survival period from the time of injury to the time of death to be actually indeed a very short interval." He declared the infant's cause of death to be "shaken impact syndrome or, more specifically, closed head trauma due to shaken impact syndrome." Such injuries "don't occur unless you're alive at the time that the injuries are inflicted." Sterbenz explained that the infant being on top of Appellant's warm body was "adequate enough to make [the infant] seem warm" to the touch. He also explained that due to lividity some bruises and contusions are not obvious until some time after death. Further, the bruises, rib fractures, and skull fracture "did not occur after death." Sterbenz found that "[t]here [were] no innocent explanations" for the infant's pattern of injuries. The infant's death was not the result of a fall, having Appellant roll over on top of her, or becoming smothered in a blanket.
 {¶ 55} On cross-examination Sterbenz testified to the following. After reviewing the infant's prior medical records he found no documentation of anything that would be indicative of abuse. He later noted that the most recent visit was three and a half weeks before her death. Sterbenz was not present in the hospital and therefore, he could not testify to the activities in the hospital. He did not know who was living with the infant when she would have received the healing rib fractures. Sterbenz did not interview Appellant or any of the infant's other family members.
 {¶ 56} On re-direct examination, Sterbenz reiterated that the infant's bruises, skull fracture, and rib fractures were "absolutely not" resuscitative or postmortem injuries.
 {¶ 57} Dr. R. Darryl Steiner ("Steiner"), a physician in the ER and an expert witness in the area of shaken baby syndrome, testified next for the State. Steiner explained shaken baby syndrome and testified to the following. Shaken baby syndrome can occur just once, it does not have to be a pattern of abuse. Since infants cannot describe where something hurts, one may have injured ribs and the symptoms would be "crying, fussiness, maybe even describe [the infant] as colicky, when the pain is really due to an injury that has occurred but has not been detected." Rib fractures would not occur from a baby being placed on a couch and given CPR or being struck in the back to ensure an airway.
 {¶ 58} The trigger for shaken baby syndrome is "uncontrollable crying." When a caretaker cannot comfort a crying baby, they become frustrated and "when that frustration escalates, the violence of the shaken baby syndrome occurs, with the care provider being angry and frustrated * * * and the violence of the shaking occurs." The shaking stops the crying "because the brain is injured to the point that crying stops and the child is unconscious."
 {¶ 59} Steiner reviewed the infant's medical records from Chicago and Children's and the autopsy report, including the photographs. He confirmed the medical findings of Sterbenz regarding the infant's injuries. Steiner concluded that the infant "died of abusive head injury with the mechanism being most likely the shaken baby syndrome with impact." In order for the infant to sustain the injuries she did, the force used had to be "viscous, massive trauma[.]" When inflicting such injuries "there's no noise[.] Other than a crying infant that triggers it, but then that stops when the shaking occurs. So there's no noise. It's quiet."
 {¶ 60} After reciting the facts as presented to Children's staff and Guenther by Appellant, the State asked Steiner what injuries the infant should have displayed. Steiner responded as follows. The infant should not have had any injuries because no trauma occurred. Steiner would not expect to find fractured ribs, contusions on the neck and head, a skull fracture, bilateral hemorrhaging, or bilateral hematoma from the facts as reported by Appellant. The infant's injuries could not have resulted from an adult rolling onto the infant or the infant falling off of a couch. The injuries could not have occurred after the infant had died.
 {¶ 61} Detective Randy Tlumac ("Tlumac") of the Cuyahoga Falls Police Department testified next for the State. He testified to the following. Tlumac received a call that Guenther requested to speak to a detective about the death of an infant. After speaking with Guenther, it was decided that Tlumac would attend the infant's autopsy. Upon learning of Sterbenz's findings during the autopsy, Tlumac contacted other members of his police department and an investigation commenced. Tlumac interviewed Flach and spoke with one of the paramedics that responded to the house.
 {¶ 62} Detective Cheryl Desko ("Desko") of the Cuyahoga Falls Police Department testified after Tlumac. Desko testified to the following. She was involved in the investigation of the infant's death. Part of her duties involved interviewing Appellant. On Monday August 4, 2003, she contacted Appellant's mother to set up an interview with Appellant and learned that Appellant and his wife were en route to Chicago to make funeral arrangements for the infant. Desko arranged a meeting with Appellant for later that day at the Cuyahoga Falls Police Station. Desko was aware of the M.E.'s preliminary findings before she began the interview. She interviewed Appellant around 4:00 in the afternoon.
 {¶ 63} During Desko's interview, Appellant informed her that he and his family had come to Cuyahoga Falls to visit his parents. On Wednesday July 30, 2003, while on a drive with his wife and toddler, he and his wife had an argument, but Appellant did not explain further. The next day Appellant, his wife, and both children went to Summit Mall and out to eat.
 {¶ 64} Appellant told Desko that on Friday, August 1, 2003, he went to a 10:00 a.m. appointment with his wife, their children and Flach. That afternoon Appellant's wife, his mother and his step-brother drove to Chicago because his wife had business to attend to. Appellant, his children and Flach remained at the house the rest of the day. They took a car ride around 8:30 p.m. and went to a drive-thru. The infant had been "fussy pretty much the whole time." Appellant reported that the infant had been colicky and screaming/yelling.
 {¶ 65} When the group returned home they watched television and Flach commented that he could not believe the toddler could sleep during the infant's crying. Appellant told Desko that Flach went to bed before him and the children. When Appellant took the children to bed they all shared the bed in the guest room. At approximately 2:30 or 3:00 a.m., the infant woke up screaming and crying. Appellant tried to feed her and bundle her up, but she continued to scream and cry for a couple of hours so he decided to take both children for a drive. They left the house around 5:00-5:30 a.m. and Appellant drove around for about an hour. The infant had fallen asleep during the drive, but as soon as he started to get her out of the car she started crying again. Appellant took the infant in the house and attempted to give her a bottle, but she would not take it. Appellant's next statement was that they just fell asleep. Appellant awoke when Flach came downstairs and asked about the infant. Appellant then discovered that the infant was not breathing.
 {¶ 66} Desko confronted Appellant about the injuries the infant sustained and Appellant denied any knowledge of how she obtained the injuries. He did not have an answer to how the infant was injured. Desko asked him about various accident scenarios and he denied having any involvement in the infant's injuries. He did state that the infant bumps into things all the time. The only times the infant was in anyone else's care was Wednesday night when the Flach's watched her and when he showered on Thursday when his wife was caring for her. Appellant did not place anyone else alone with the infant at the time her injuries were inflicted. Appellant provided no explanation as to who may have hurt the infant or how she was injured.
 {¶ 67} On cross-examination, Desko testified to the following. Appellant voluntarily came to the police station and cooperated during the questioning. Appellant had periods of crying during the interview and consistently denied harming his child.
 {¶ 68} After the State called its last witness, the following exhibits were admitted into evidence: the EMS report; medical records from Children's; various photographs taken of the infant before, during, and after the autopsy; the medical examiner's report of investigation; the 911 tape; the autopsy report; and photographs of the house's guest and living rooms. Upon the admission of the exhibits, the State rested its case. Appellant then made a Crim.R. 29 motion. The court denied the motion finding: "[T]he state of the evidence is sufficient to present those charges to the jury, and the motion is overruled." But the court noted that it would be instructing the jury on "reckless homicide as a lesserincluded offense for the two felony murder charges [.]"
 {¶ 69} Patrick Lockett ("Lockett"), Appellant's Staff Sergeant in the United States military, testified first for Appellant. Lockett testified to the following. Appellant was under his command in Germany and became his brother-in-law after Appellant left the military. Appellant was an outstanding soldier. Lockett never witnessed Appellant lose his temper with his toddler and he felt he "couldn't have been a better father." Lockett testified that as soon as he and his wife learned of the infant's death they drove to Ohio from Kentucky. When he saw Appellant that evening, Appellant said: "`There's nothing I could have did. * * * I couldn't help her. That's the thing that hurts the worst is I couldn't help my baby.'" Lockett did not have any further discussions with Appellant about what happened to the infant.
 {¶ 70} When asked about his feelings towards Appellant, Lockett responded:
"I love him like a brother. He's a brother-in-law to me. I'd give him anything I got. If anything was to happen to me and my wife I'd have him watch my son. He would be the sole provider of my son, and I know he'd do an outstanding job just as I would as a father."
 {¶ 71} On cross-examination, Lockett testified to the following. Appellant knows how to take care of babies and he knows what would hurt babies. Lockett knows of no time before August 1, 2003 when Appellant was alone overnight with his children. As part of training procedures provided by the military, Appellant attended child development and family spouse counseling classes. In those classes, Appellant would have learned that one should never shake a baby and about shaken baby syndrome.
 {¶ 72} Carlos Venegas ("Venegas"), Appellant's father-in-law, testified next for Appellant. Venegas testified to the following. Venegas raised six children of his own and Appellant, his wife (Venegas' daughter), and their two children had been living in Venegas' home. Venegas did not think there was anything wrong with the infant. Venegas considered Appellant a good father and husband. From February of 2003 to July 24, 2003, which was the time period Appellant lived in his home, Venegas never witnessed Appellant lose his temper or become violent. If Venegas believed Appellant had harmed the infant, he would not have agreed to testify. When the family went to the hospital on Tuesday August 5, 2003, Christopher informed them the baby had died from SIDS.
 {¶ 73} Venegas testified to the following on cross-examination. Venegas had no explanation for how the infant had 27 healing fractured ribs, which based on prior testimony she received when she was staying in his home. Appellant had never been the sole overnight caregiver for his children before the night of August 1, 2003.
 {¶ 74} Juana Morris ("Morris"), Appellant's wife and the infant's mother, testified last for Appellant. Morris testified to the following. Appellant was a good husband and good father. The infant was a "very good baby." The infant did not cry as much as the couple's first child did. Morris never witnessed Appellant get violent when their first child cried for up to an hour at a time. Morris did leave the toddler and the infant in Appellant's care when she ran errands. Morris could not explain how the infant's ribs were fractured.
 {¶ 75} They arrived in Ohio on July 24, 2003 and Appellant was not with Morris, their children or his family from July 25 through July 31.[1] When Appellant returned to his mother and stepfather's home, he and Morris had what Morris classified as a discussion, not an argument. Appellant never hit Morris or their children. Appellant "walk[ed] away" whenever an argument or fight started. Morris went back to Chicago on August 1, 2003 to take a physical for reenlistment in the military. In order to take the physical Morris had to be "housed" at the military facility, so she was not able to care for her children during the physical process.
 {¶ 76} Morris spoke with Appellant around 11:00 p.m. on Friday August 1, 2003, and he told her the children were sleeping and she did not hear any crying. On the morning of Saturday, August 2, 2003, Flach called Morris and asked if his wife had already headed back to Ohio and Morris told him yes. Flach then hung up. Then Morris' older sister, Nancy, came over and told Morris that the infant had passed away. Morris immediately called Appellant and he was crying and she kept asking what happened and begging that it was not true. Morris then took the next available flight to Ohio. When Morris arrived at the hospital, Appellant told her the doctors said the baby died from SIDS.
 {¶ 77} Morris continued her testimony testifying to the following. Appellant told her that he woke up and the infant was not breathing and that the paramedics and doctors were not able to save her. Appellant did not tell her that he did anything to the infant. Morris felt Appellant was being honest with her. When Morris talked to Christopher days later he told her that the infant died from SIDS. Morris would not have testified if she believed that Appellant had harmed the infant.
 {¶ 78} On cross-examination, Morris testified to the following. Morris took the infant to a clinic three days after her birth because she was vomiting at night and was congested. The infant's next visit was a week later, June 6, 2003. On June 20, 2003, Morris took the infant back to the doctor because the baby was still vomiting at night and her left eye was red and swollen. Morris took her for a last visit on July 8, 2003. The doctors told Morris the infant may have been colicky.
 {¶ 79} Appellant had told Morris that the infant had been crying for a long time Friday night into Saturday morning. It was unusual and uncharacteristic for the infant to cry for over two hours. The infant would normally sleep through the night. Appellant never told Morris that the infant would bump into things. Morris could not explain how the infant's skull was fractured. Appellant told her he did nothing to the infant and she believed him.
 {¶ 80} When questioned about statements she made to Tlumac about Appellant sometimes getting frustrated with their children, Morris' answers became contradictory. When asked if she told Tlumac that "she would take the kids back before [Appellant] got to a breaking point and things got too bad for him[,]" Morris first denied making the statement, then admitted it, and then said she did not remember saying that. Appellant told Morris he was never apart from the infant from the time Morris left for Chicago until he discovered she was not breathing.
 {¶ 81} On re-direct examination, Morris remembered telling Tlumac that Appellant would sometimes get frustrated with their children but never to the extent that she felt the children were in danger.
 {¶ 82} After the court admitted the infant's medical records from Chicago, Appellant rested his case.
 {¶ 83} The State then called Tlumac as a rebuttal witness. Tlumac testified to the following. Tlumac interviewed Morris on August 4, 2003. Morris told Tlumac that sometimes when Appellant would come home from work he would get frustrated when dealing with their children. Morris never felt the children were in danger, but she would take the children away from him before things got too bad for him. Tlumac did not take a written statement from Morris, but he testified that he used Morris' words for his notes and report.
 {¶ 84} In the first portion of his argument that his convictions were against the manifest weight of the evidence, Appellant has alleged that the State failed to prove beyond a reasonable doubt that he was the perpetrator of the crimes against his daughter. We disagree.
 {¶ 85} As the State has argued and the record clearly shows, Appellant was the sole care provider for the infant at the time she received the lethal injuries. The trial testimony established that the infant was never out of Appellant's care and that no one else had physical contact with the infant during the time the lethal injuries were inflicted. Accordingly, Appellant's argument that the jury was not presented with evidence beyond a reasonable doubt that he was the perpetrator is without merit.
 {¶ 86} In his second argument that his convictions were against the manifest weight of the evidence, Appellant has argued that the State failed to establish the applicable mens rea for each of his crimes. We disagree.
 {¶ 87} The trial court gave the following jury instruction on knowingly, which was the mens rea for count one, murder with felonious assault as the predicate offense, and count three, felonious assault.
"A person acts knowingly, regardless of his purpose, when he's aware that his conduct will probably cause a certain result. * * *
"[K]knowledge is determined from all the facts and circumstances in evidence. You will determine from these facts and circumstances whether there existed at the time in the mind of the defendant an awareness of the probability that he would cause serious physical harm."
 {¶ 88} The court gave the following jury instruction on reckless, which was the mens rea for count two, murder with endangering children as the predicate offense, and count four, endangering children.
"A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result.
"A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
"Risk means significant possibility, as contrasted with a remote possibility, that a certain result may occur."
 {¶ 89} Based on the previously recited trial testimony, we find that the trial court's conclusion that Appellant acted knowingly and recklessly when he injured and ultimately killed his daughter was not against the manifest weight of the evidence. The uncontroverted testimony showed that Appellant knew how to handle a baby, that he knew one should never shake a baby, and that he knew about shaken baby syndrome. In fact, testimony revealed that he had taken classes on such topics. Accordingly, Appellant's argument is not well taken.
 {¶ 90} In his final argument in his first assignment of error, Appellant has argued that "even if" he committed the acts alleged, the most he is criminally guilty of is reckless homicide. We disagree.
 {¶ 91} We agree with the State that the jury heard the testimony of the witnesses, specifically Sterbenz and Steiner, and justly found Appellant guilty as charged in the indictment. The jury received instructions on reckless homicide and declined to find Appellant guilty of that lesser included offense. We do not find that such a decision was against the manifest weight of the evidence.
 {¶ 92} After careful review of the entire record, weighing the evidence and all reasonable inferences and considering the credibility of witnesses, this Court cannot conclude that the jury clearly lost its way when it found Appellant guilty of one count of murder with felonious assault as the predicate offense, one count of murder with endangering children as the predicate offense, one count of felonious assault, and one count of endangering children.
 {¶ 93} Based on the foregoing, this Court cannot find that Appellant's convictions were against the manifest weight of the evidence. Accordingly, Appellant's first assignment of error lacks merit.
 Assignment of Error Number Two
"Defendant-appellant was denied effective assistance of counsel at trial."
 {¶ 94} In his second assignment of error, Appellant has argued that he was denied the effective assistance of trial counsel. Specifically, Appellant has argued that his trial counsel was ineffective because 1) he failed to renew Appellant's Crim.R. 29 motion to preserve a sufficiency argument on appeal and 2) he failed to request a jury instruction on involuntary manslaughter. We disagree.
 {¶ 95} Appellant bears the burden of proof in a claim of ineffective assistance of counsel. State v. Colon, 9th Dist. No. 20949, 2002-Ohio-3985, at ¶ 49. Appellant must overcome the strong presumption that counsel's performance was adequate and that counsel's action might be sound trial strategy. State v. Smith (1985), 17 Ohio St.3d 98, 100. Furthermore, an attorney properly licensed in Ohio is presumed competent. State v. Lott
(1990), 51 Ohio St.3d 160, 174, certiorari denied (1990), 498 U.S. 1017,111 S.Ct. 591, 112 L.Ed.2d 596.
 {¶ 96} In order to overcome his burden and establish an ineffective assistance of counsel claim, Appellant must satisfy a two-prong test. First, Appellant must demonstrate that trial counsel's performance was deficient. Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052, 80 L.Ed.2d 674. To establish a deficiency, Appellant must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed Appellant by the Sixth Amendment. Id. Appellant must identify the acts or omissions of his attorney that he claims were not the result of reasonable professional judgment. State v.Palmison, 9th Dist. No. 20854, 2002-Ohio-2900, at ¶ 31. This Court must consider the facts of this particular case as they existed at the time of trial counsel's conduct and then we must decide whether counsel's conduct fell outside the range of that which is considered professionally competent. Id.
 {¶ 97} To prove his claim of ineffective assistance of counsel Appellant must also demonstrate that he was prejudiced by his trial counsel's deficient performance. Id. at ¶ 30. Prejudice entails "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley (1989),42 Ohio St.3d 136, paragraph three of the syllabus, certiorari denied (1990), 497 U.S. 1011, 110 S.Ct. 3258, 111 L.Ed.2d 768. This requires a showing that counsel's errors were so serious as to deprive Appellant of a fair trial. Strickland, 466 U.S. at 686-687.
 {¶ 98} In his first argument of ineffective assistance of counsel, Appellant has argued that his counsel was ineffective for failing to renew his Crim.R. 29 motion. Although it is customary for defense counsel to renew a Crim.R. 29 motion at the close of its case to test the sufficiency of the state's evidence, "the failure to follow that course of action [does] not mean the performance of a defendant's trial counsel fell below a reasonable standard of representation." (Citation omitted).State v. Fetter, 9th Dist. No. 03CA0012, 2003-Ohio-5778, at ¶ 21. Despite this custom of raising a motion for acquittal, we recognize that counsel is not required to raise meritless motions. See State v.Tibbetts (2001), 92 Ohio St.3d 146, 164-165, certiorari denied (2002),534 U.S. 1144, 122 S.Ct. 1100, 151 L.Ed.2d 997; State v. Bradley (2001),91 Ohio St.3d 570, 571.
 {¶ 99} We are not persuaded by Appellant's assertion that his trial counsel should have moved for an acquittal pursuant to Crim.R. 29 on the grounds that the State failed to present sufficient evidence to sustain his convictions. In resolving Appellant's first assignment of error, we concluded that his convictions for two counts of murder, one count of felonious assault, and one count of endangering children were not against the manifest weight of the evidence. Based on our previous finding that "a determination that [a] conviction is supported by the weight of the evidence [is] dispositive of the issue of sufficiency," we find that a motion for acquittal based on insufficient evidence would have been meritless. See State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at 4. Accordingly, the failure of Appellant's trial counsel to move for acquittal pursuant to Crim.R. 29 did not constitute ineffective assistance of counsel.
 {¶ 100} Appellant's second argument that he was denied the effective assistance of counsel centers on his trial counsel not requesting a jury instruction on involuntary manslaughter. An attorney's decision not to request a particular jury instruction is a matter of trial strategy and does not establish ineffective assistance of counsel. State v. Fisk, 9th Dist. No. 21196, 2003-Ohio-3149, at ¶ 9, citing State v. Hill (1995),73 Ohio St.3d 433, 443; State v. Coleman (1989), 45 Ohio St.3d 298, 307-08, certiorari denied (1990), 493 U.S. 1051, 110 S.Ct. 855, 107 L.Ed.2d 849; See, also, State v. Dubois, 9th Dist. No. 21284, 2003-Ohio-2633, at ¶ 5, citing State v. Griffie (1996), 74 Ohio St.3d 332, 333. Appellant has not provided sufficient evidence to contradict that his trial counsel's performance was adequate and that counsel's action, as well as inaction, was sound trial strategy under the circumstances of the case. Further, we will not second-guess Appellant's trial counsel's decision not to request the involuntary manslaughter instruction, especially given that his trial counsel's theme throughout the trial was that there was no proof that Appellant committed any crime.
 {¶ 101} Based on the foregoing, this Court finds that Appellant has not demonstrated that a failure to renew his Crim.R. 29 motion was deficient lawyering or that not requesting a jury instruction on involuntary manslaughter was anything other than a sound trial strategy. We further find that Appellant has not demonstrated that the outcome of the trial would have been different had his Crim.R. 29 motion been renewed or had a jury instruction on involuntary manslaughter been given. Appellant's second assignment of error is without merit.
 Assignment of Error Number Three
"Appellant was denied a fair trial where, contrary to EVID.R. 403(a) and 404(b), the trial court permitted the state to question defendant-appellant's stepfather about an alleged prior act of violent behavior."
 {¶ 102} In his third assignment of error, Appellant has argued that the trial court erred when it permitted the State to question a witness about Appellant's prior bad acts. Specifically, Appellant has argued that the trial court erred when it allowed the State to question his stepfather about an allegedly violent relationship Appellant had with a former girlfriend. We disagree.
 {¶ 103} A trial court possesses broad discretion with respect to the admission of evidence. State v. Ditzler (Mar. 28, 2001), 9th Dist. No. 00CA007604, at 4, citing State v. Maurer (1984), 15 Ohio St.3d 239, 265. An appellate court will not overturn the decision of a trial court regarding the admission or exclusion of evidence absent a clear abuse of discretion that has materially prejudiced the defendant. Ditzler, at 4. An abuse of discretion is more than an error of judgment, but instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619,621. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Id.
 {¶ 104} Appellant has argued that the State's questioning of his stepfather, Flach, amounted to the inappropriate introduction of character evidence regarding prior bad acts. The State has argued that Appellant did not object to its questions and that Flach's testimony was not prejudicial. A recitation of Flach's testimony is necessary to resolve this issue.
 {¶ 105} The following colloquy occurred during Appellant's cross-examination of Flach:
Appellant's counsel: "Did you ever see [Appellant] be violent with anyone?"
Flach: "No."
Appellant's counsel: "Or smack somebody around, or lose his temper, or any of that?"
Flach: "No, he was a good kid."
* * *
Appellant's counsel: "How did [Appellant] treat his [toddler]? Did you observe him with his [toddler]?"
Flach: "Oh, he loves his [toddler]. He was always holding him, always doing stuff to him."
Appellant's counsel: "Did you ever see [Appellant] get violent with him?"
Flach: "No."
Appellant's counsel: "Did you ever see [Appellant] lose his temper with his kid?"
Flach: "No."
On re-direct examination, the following colloquy occurred:
State: "Now, you testified that you never saw [Appellant] violent or smacking someone around?"
Flach: "Yes."
State: "Do you know Tracy Lynn Gard?"
Flach: "Yes."
State: "Do you know the relationship [Appellant] had with Tracy Lynn Gard?"
Flach: "Yeah. They were boyfriend and girlfriend."
State: "Do you know how that relationship ended?"
Flach: "They broke up."
State: "And in 1997 do you know if that relationship didn't involve violence?"
Flach: "I don't know."
State: "Well, he's living at your house at that time. Were you aware?"
Appellant's counsel: "Objection."
Court: "Overruled."
State: "Were you aware of what was going on between them?"
Flach: "I knew they had fights, yes."
State: "Physical fights?"
Flach: "I don't know about the physical fights. I never saw anything like that."
State: "And if it happened in your house would you know about it?"
Flach: "I wouldn't know about it if I was at work."
 {¶ 106} Flach continued his testimony, stating that he believed Appellant was a good father and did not observe any problems with Appellant and his children. Flach never witnessed Appellant lose his temper with his children.
Pursuant to Evid.R. 403(A), "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice[.]" A companion rule, Evid.R. 404(B) mandates that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."
 {¶ 107} We must first note that contrary to the State's argument, although not immediately, Appellant did object to the State's questioning of Flach about Appellant's relationship with his former girlfriend.
 {¶ 108} Called as a witness by the State, Flach made no mention of Appellant and a history of violence and the State did not submit any questions relating to such issues. Rather, it was the defense during cross-examination of Flach that chose to introduce testimony about Appellant's character and ask questions about any violent behavior. Having opened the door to an inquiry of violence precludes Appellant's complaint that prior bad acts testimony was wrongly admitted. Only after Appellant opened the violent history doors did the State step through and explore Appellant's behavioral history. On re-direct, with questions about Appellant and violence already raised and admitted, the State basically tracked the same line of questioning.
 {¶ 109} The State's exploration of Appellant's line of questioning did not result in any testimony that Appellant had a violent streak or a temper. To the contrary, the allegedly prejudicial testimony revealed that Flach never witnessed any violence or out of control temper. Flach's answers to the State's follow-up questions ended the inquiry for the State. Based on the foregoing, we find that Appellant opened the door to testimony about Appellant and his history of violence when he asked Flach if he had ever witnessed Appellant act in a violent manner "with anyone." Therefore, the trial court did not abuse its discretion in allowing the State's follow-up line of questioning.
 {¶ 110} Assuming arguendo that Appellant's counsel did not open the door, we find that no prior bad acts testimony was admitted. As previously discussed, Flach denied any knowledge of Appellant being violent with anyone and he specifically testified that he never witnessed Appellant act violently with his children or lose his temper with them. Accordingly, Appellant's complaint of prior bad acts testimony being admitted is unfounded because the trial court did not abuse its discretion by admitting evidence that unfairly and materially prejudiced Appellant or showed that he acted in conformity with a violent history.
 {¶ 111} Appellant's third assignment of error is not well taken.
 III {¶ 112} Appellant's three assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Slaby, P.J. concurs.
Carr, J. concurs in judgment only.
[1] There was no testimony as to where Appellant was during this time period.